

MANDATE

# UNITED STATES COURT OF APPEALS
## FOR THE
## SECOND CIRCUIT

_____

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 8th day of July, two thousand and sixteen.

Before:        Dennis Jacobs,
              Peter W. Hall,
                    *Circuit Judges*,
              Jane A. Restani,
                    *Judge*.\*

_____

United States of America,

        Appellant,

v.                                 **JUDGMENT**
                                 Docket No. 15-1282

Danielle Faux,

        Defendant - Appellee.

_____

The appeal in the above captioned case from an order of the United States District Court for the District of Connecticut was argued on the district court's record and the parties' briefs.   Upon consideration thereof,

IT IS HEREBY ORDERED, ADJUDGED and DECREED that the order of the district court is VACATED and the case is REMANDED for further proceedings consistent with this Court's opinion.

For The Court:

Catherine O'Hagan Wolfe,
Clerk of Court

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

_____
\* The Honorable Jane A. Restani, Judge for the United States Court of International Trade, sitting by designation.

MANDATE ISSUED ON 07/29/2016

15-1282-cr
*United States v. Faux*

## UNITED STATES COURT OF APPEALS

## FOR THE SECOND CIRCUIT

August Term, 2015

(Argued: March 22, 2016     Decided: July 8, 2016)

Docket No. 15-1282-cr

- - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA,

        *Appellant*,

    - v.-

DANIELLE FAUX,

        *Defendant-Appellee*.

- - - - - - - - - - - - - - - - - - -x

Before:        JACOBS and HALL, *Circuit Judges*, and RESTANI, *Judge*.[*]

---

[*]    The Honorable Jane A. Restani, Judge for the United States Court of International Trade, sitting by designation.

The United States appeals from an order entered in the District of Connecticut (Underhill, *J.*), suppressing statements made during an interview that was conducted in the defendant's home while a search warrant was executed.  We conclude that the interview was not a custodial interrogation and that the statements therefore should not have been suppressed.  Accordingly, we vacate and remand for further proceedings consistent with this opinion.

> DAVID J. SHELDON, Assistant United States Attorney, for Deirdre M. Daly, United States Attorney for the District of Connecticut (*with* Mark H. Silverman, Assistant United States Attorney, *on the brief*), New Haven, Connecticut, *for the United States of America.*

> BRADLEY D. SIMON, Simon & Partners, LLP, New York, New York, *for Defendant-Appellee.*

DENNIS JACOBS, *Circuit Judge*:

The United States appeals from an order suppressing statements made by defendant Danielle Faux during a two-hour interview that was conducted in her home while a search warrant was being executed.  The underlying allegation is that Faux fraudulently submitted bills for physical therapy sessions (which

would be insurable) that were in fact (uninsured) sessions with personal trainers. The United States District Court for the District of Connecticut (Underhill, *J.*) ruled that the circumstances of the interview amounted to a custodial interrogation and that the statements must be suppressed because *Miranda* warnings were not given.  It can hardly be denied that the conditions of the interview exerted coercive pressure on Faux: armed law enforcement personnel entered her home at dawn, her vacation plans were abruptly canceled, and she was accompanied by an agent when she moved about her home; however, the circumstances did not rise to the level of a "custodial interrogation," which is defined narrowly in our case law as circumstances akin to formal arrest.  The Government stepped right up to the limits of constitutionally permissible conduct and, based on the facts accepted by the district court, just managed to toe the line.  Accordingly, we vacate the order of the district court and remand for further proceedings not inconsistent with this opinion.

## BACKGROUND

Following an evidentiary hearing, the district court described the factual background in its ruling on suppression.  Our summary of the facts is taken from

the district court's ruling.  However, the district court did not purport to make

actual findings of fact on several contested issues -- especially on points where

the record evidence was inconsistent -- choosing instead to summarize the

evidence.[1]  Our analysis rests on the factual findings the district court explicitly

made, and we do not resolve the factual conflicts in the record.

Danielle Faux owns and operates a physical therapy practice in Norwalk,

Connecticut; she is also part-owner of a gym in the same building.  Faux

sometimes refers her physical therapy patients for sessions with personal trainers

at her gym.  Only physical therapy services provided by a licensed physical

therapist are covered by Medicare and by the insurance companies for which

Faux was a participating provider; personal training services are of course not

covered by insurance.

A former business partner of Faux approached the Government about a

scheme to defraud Medicare and insurance companies by billing personal

---

[1]   Faux elected not to testify at the evidentiary hearing.  It appears likely,
however, that the district court was not able to credit her version of the events
when it conflicted with the Government's version.  Faux's account was presented
in an affidavit and was not subject to cross examination; the Government's
evidence included live testimony from the two agents who conducted the
interview and were subject to cross examination.

training sessions as physical therapy.  The Government conducted an 18-month

investigation into Faux's business: grand jury subpoenas were issued for Faux's

billing and financial records, and Faux's former partner wore a wire to record

conversations with Faux and with Faux's patients.

A search warrant was executed at her home on December 8, 2011, "just as

the sun was coming up."  Approximately 10 to 15 agents[2] from three agencies[3]

executed the search warrant.  Upon their arrival, the agents saw Faux's husband,

Nicholas Corwin, who was in the driveway loading their car with suitcases in

preparation for the couple's departure for a vacation in Mexico.  The agents

approached Corwin, identified themselves, and advised him that they were there

to execute a search warrant.

---

[2]   The district court did not explicitly resolve whose testimony was most reliable regarding the number of agents and instead appeared to rely on all available testimony in making its estimate.  One agent testified that there were approximately ten agents; another agent testified that there were approximately eleven agents; and Faux's affidavit asserted that there were thirteen to fifteen agents.

[3]   The FBI; the U.S. Dep't of Health and Human Services, Office of the Inspector General ("HHS-OIG"); and the Criminal Investigations Division of the IRS.

The agents entered the house through a door between the garage and the main front door.  Faux was at the end of the hallway, fully dressed and toting luggage.  The two agents tasked with questioning Faux, FBI Special Agent Matthew McPhillips and HHS-OIG Special Agent Lucille Fontes, approached her and told her they had warrants to search her residence and her physical therapy practice.  Faux volunteered that the use of personal trainers was entirely separate from her physical therapy practice.  McPhillips testified that he "responded very bluntly, very directly, back to her in a manner in which she would understand that I didn't believe what she was telling me." *United States v. Faux*, 94 F. Supp. 3d 258, 265 (D. Conn. 2015).

Faux informed the agents that she was about to leave for vacation. According to Faux, McPhillips replied that she was "not going anywhere." *Id.*  It is unclear whether in context the statement would be an order or a prediction, and McPhillips denied making that statement, or otherwise telling Faux to cancel her plans, or making any similar threats.  The district court made no explicit finding as to whether the statement was made; instead, the district court found that "[w]hether or not McPhillips made that statement, that is the message that would have been communicated to a reasonable person in Faux's situation." *Id*. at 277.

The district court further inferred that "[i]t is impossible to believe that Faux voluntarily chose to answer questions for two hours rather than choosing to go on a vacation with relatives." *Id.* This inference was reinforced for the district court by the seizure of her cell phone, which left her with "no means to tell the others traveling that the vacation had been interrupted." *Id.* It is "undisputed" that both agents heard Faux inform her husband that their vacation would be cancelled because agents were there to discuss the "crossover" of the businesses, and neither agent reassured Faux that cancellation or postponement was unnecessary. *Id.* at 265.

During the execution of the warrant and the interview, McPhillips and Fontes were dressed in business attire. Many of the other agents wore jackets that identified them as law enforcement. Neither McPhillips nor Fontes drew a weapon while at Faux's residence. However, according to Faux's affidavit, she knew or believed that most, if not all, of the agents present at her home were armed. (She was correct.)

The questioning took place in Faux's dining room. Faux asserts that she was escorted there while an agent held her arm, whereas Fontes testified that Faux went "on her own volition" and that the agents did not touch her. Faux's

7

husband, Corwin, was questioned in the living room, and the agents did not offer Faux an option to be in the same room.

During the two-hour interview, Faux was not allowed to move freely in her home: Fontes accompanied her to the bathroom and stood outside the door, and accompanied Faux to her bedroom when she wanted to get a sweater.  The agents testified that the restrictions on Faux's movement and on her ability to communicate (her cell phone was seized) were for the purposes of (1) officer safety and (2) evidence preservation; but there is "no indication that Faux was ever informed of those rationales."  *Faux*, 94 F. Supp. 3d at 266.

Both agents testified that the questioning was conversational and that they did not raise their voices.  McPhillips testified that Faux seemed calm and comfortable and at one point even joked with the agents.  Fontes testified that Faux seemed "worried."  Faux's affidavit stated that she felt threatened, scared, and intimidated by the agents and that she did not think she was free to leave. Both agents testified that Faux never expressed a desire to terminate the interrogation and that she would have been free to leave the residence if she had asked.

8

Faux was never specifically informed that her participation was voluntary,

that she did not have to answer questions, or that she was free to leave.

However, 20 minutes into the interview she was told that she was "not under

arrest."[4]  Faux says that she asked McPhillips whether she needed a lawyer, and

Faux says that McPhillips responded "not yet."  Both agents denied that

McPhillips made that statement and that Faux ever asked about a lawyer.  The

district court made no specific finding as to whether Faux actually requested a

lawyer.

After the investigation was complete, Faux was indicted for health care

fraud.[5]  Faux moved to suppress the statements she made during the execution of

the search warrant; she argued that the interview was under circumstances that

amounted to a custodial interrogation and that her statements must be

---

[4]    In its ruling the district court stated that McPhillips told Faux that she was
"not in custody."  *Faux*, 94 F. Supp. 3d at 266.  However, according to the
transcript from the suppression hearing, McPhillips testified that he told Faux
"that she was not under arrest and that we were simply just trying to talk about
these, these issues."  Suppression Hr'g Tr. at 23.

[5]    Specifically, she has been charged with health care fraud, in violation of 18
U.S.C. § 1347, obstruction of a federal audit, in violation of 18 U.S.C. § 1516, filing
a false statement on a tax return, in violation of 26 U.S.C. § 7206, and aiding and
abetting under 18 U.S.C. § 2.

suppressed because she was never given *Miranda* warnings.  The district court

granted the motion, and the Government now appeals that suppression ruling.[6]


## DISCUSSION

On appeal from a suppression ruling, we review factual findings for clear

error and we review questions of law de novo.  *United States v. Rodriguez*, 356

F.3d 254, 257-58 (2d Cir. 2004).  We have sometimes posited that on a suppression

motion we review facts both for clear error *and* in the light most favorable to the

prevailing party; but we have recently observed: "[a] requirement that the

evidence be viewed in favor of one side or the other would be at odds with the

notion that deference must be given to the factfinder's view of the evidence, and,

for example, where there are two permissible views of the evidence, the less

favorable of the two would not be clearly erroneous."  *United States v.*

*Bershchansky*, 788 F.3d 102, 110 (2d Cir. 2015).  In the absence of conflicting in-

court testimony on material matters, we need not resolve that tension now.

---

[6]    We have jurisdiction over this interlocutory appeal pursuant to 18 U.S.C.
§ 3731.

# I

Statements made during a custodial interrogation are generally

inadmissible unless a suspect has first been advised of his or her rights.  *Miranda*

*v. Arizona*, 384 U.S. 436, 444 (1966).  It is uncontested that Faux was never so

advised, and it is undisputed that the questioning constituted an "interrogation"

because the agents expressly questioned Faux about potentially incriminating

activities.  *See Rhode Island v. Innis*, 446 U.S. 291, 300-302 (1980) (defining

interrogation as "words or actions on the part of police officers that they *should*

*have known* were reasonably likely to elicit an incriminating response").

Accordingly, the only contested issue is whether Faux was "in custody" at the

time she was questioned.

"'[C]ustody' for *Miranda* purposes is not coterminous with . . . the

colloquial understanding of custody."  *United States v. FNU LNU*, 653 F.3d 144,

152-53 (2d Cir. 2011).  In determining whether a suspect was in custody, a court

looks at all the surrounding circumstances.  The relevant inquiry is "how a

reasonable man in the suspect's position would have understood his situation."

*Berkemer v. McCarty*, 468 U.S. 420, 442 (1984).   The test for determining custody is

an objective inquiry that asks (1) "whether a reasonable person would have

11

thought he was free to leave the police encounter at issue" and (2) whether "a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest." *United States v. Newton*, 369 F.3d 659, 672 (2d Cir. 2004) (citing *California v. Beheler*, 463 U.S. 1121, 1125 (1983); *Stansbury v. California*, 511 U.S. 318, 322 (1994)).

Although both elements are required, the second is the "ultimate inquiry" because a "free-to-leave inquiry reveals only whether the person questioned was seized." *Newton*, 369 F.3d at 672 (internal quotation omitted).  Not all seizures amount to "custody"; a seizure is a necessary, but not sufficient, condition.  *Id.*

An individual's subjective belief about his or her status generally does not bear on the custody analysis.  Nor does the officer's perceptions, although an officer's knowledge or beliefs "may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned," but "only to the extent they would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action." *Stansbury*, 511 U.S. at 325 (quotation marks and citations omitted).

An individual who understands that her detention is "not likely to be temporary and brief" and feels that she is "completely at the mercy of police"

12

could reasonably deem her situation comparable to formal arrest. *Newton*, 369

F.3d at 675 (quoting *Berkemer*, 468 U.S. at 437-38).   Relevant considerations

include: (1) "the interrogation's duration"; (2) "its location (*e.g.*, at the suspect's

home, in public, in a police station, or at the border)"; (3) "whether the suspect

volunteered for the interview"; (4) "whether the officers used restraints"; (5)

"whether weapons were present and especially whether they were drawn"; and

(6) "whether officers told the suspect he was free to leave or under suspicion."

*FNU LNU*, 653 F.3d at 153 (internal citations and alterations omitted).

   The location of the interrogation in this case -- Faux's home -- is important.

The home is "the most constitutionally protected place on earth"; thus, the right

to terminate the interrogation and be "free to leave" is "hollow" if the one place

that the individual cannot retreat to, or exclude law enforcement from, is her

home. *See United States v. Craighead*, 539 F.3d 1073, 1082-83 (9th Cir. 2008).   At

the same time, courts rarely conclude, absent a formal arrest, that a suspect

questioned in her own home is "in custody."  *See*, *e.g.*, *United States v. Badmus*, 325

F.3d 133, 139 (2d Cir. 2003) ("[G]iven the district court's factual findings -- and in

particular its finding that the agents informed the defendant and his wife that

they were not under arrest and could ask the agents to leave at any time . . . we

find that a reasonable person would have understood that he or she was not in custody." (citations omitted)); *United States v. Mitchell*, 966 F.2d 92, 98-99 (2d Cir. 1992) (reversing district court where in-home interview was "cooperative" and there was no speech or action that could reasonably be taken as intimidating, coercive, or restricting defendant's freedom of action); *Campaneria v. Reid*, 891 F.2d 1014, 1020 n.1 (2d Cir. 1989) (declining to find that statements were made in custody because "the officers had not physically or verbally indicated to [defendant] that he was not free to leave").

The home may sometimes become a custodial setting.  In *Orozco v. Texas*, the defendant was determined to be in custody when four officers entered his bedroom at 4 a.m., questioned him without providing warnings, and testified explicitly that defendant was "under arrest and not free to leave."  394 U.S. 324, 325-27 (1969).

In *Newton*, the defendant was held to be in custody in his own home because he was placed in handcuffs -- notwithstanding that the police assured him that he was not under arrest and that the handcuffs were for safety reasons. *See Newton*, 369 F.3d at 676 ("[A] reasonable person finding himself placed in handcuffs by the police would ordinarily conclude that his detention would not

14

necessarily be temporary or brief and that his movements were now totally under the control of the police.").

In *Craighead*, the Ninth Circuit concluded that an interrogation was custodial based on the presence of eight officers in defendant's home, which was deemed a "police-dominated environment":

> When a large number of law enforcement personnel enter a suspect's home, they may fill the home such that there are no police-free rooms or spaces to which the suspect may retreat should he wish to terminate the interrogation. Similarly, when the number of law enforcement personnel far outnumber the suspect, the suspect may reasonably believe that, should he attempt to leave, he will be stopped by one of the many officers he will encounter on the way out.

539 F.3d at 1084-85. However, the number of officers is typically not dispositive: we observed in *Newton* that the presence of six officers "would not, by itself, have led a reasonable person in [defendant's] shoes to conclude that he was in custody." 369 F.3d at 675.

With these principles in mind, we review the circumstances of this case and the district court's analysis.

15

## II

The district court identified "numerous aggravating factors" that it relied upon to distinguish this case from those where home interviews were held non-custodial.

First, the district court observed that Faux was interrogated while "about a dozen" agents from three federal agencies executed the warrant, which the district court determined "would have been intimidating and would have communicated a show of force to a reasonable person, even if weapons were not drawn." *Faux*, 94 F. Supp. 3d at 275.

The number of officers present for the search of Faux's home gives considerable pause.  It is unclear from the record how many rooms are in Faux's 4,900-square-foot house, but it is probable that 10 to 15 agents would be more than enough to occupy every room simultaneously.  This raises the question of where in her home Faux could go if she was indeed "free to leave."  "If a reasonable person is interrogated inside his own home and is told he is 'free to leave,' where will he go?  The library?  The police station?"  *Craighead*, 539 F.3d at 1083.  Moreover, the need for so many officers to execute this search warrant is not readily apparent.  Nothing in the record suggests that Faux was suspected of

16

being particularly dangerous; she was being investigated for a paperwork fraud scheme, and the warrant was to search primarily for documents rather than (for example) weapons or drugs.  As the district court observed, a "reasonable person would not expect that so many armed officers would be needed to execute a search."  *Faux*, 94 F. Supp. 3d at 275.

Second, Faux was physically separated from her husband and was never explicitly told whether the agents would accommodate a request by Faux to see her husband.  As the *Miranda* Court observed, it is a police interrogation technique to separate the person being questioned from others who might give support and caution.  384 U.S. at 449.  The district court concluded that Faux had no reason to believe she would be allowed to see her husband when the agents had intentionally separated them for questioning.  On the other hand, her requests to move about (to the bathroom and her bedroom) were accommodated. And Faux had already had contact with her husband when she told him, before the interview began, that their vacation was canceled and that the agents were there to talk about the "crossover" of her businesses.  Had she asked to see her husband, alone, it seems likely that the request would have been granted.  In any event, her husband's presence in another room does not militate in favor of finding that the conditions of the interview were akin to formal arrest.

17

Third, Faux was not permitted to move freely about her home during the

two-hour interrogation; agents accompanied her to the bathroom and to her

bedroom to fetch a sweater.  Although monitoring her movements had a

legitimate law enforcement purpose (*i.e.*, to preserve evidence), she was not told

the reason she was being shadowed.  The district court found that a reasonable

person in her position would have understood this restriction as a marker of

custody.

The condition imposed on her movements did not amount to custody.  *Cf.*

*United States v. Ross*, 719 F.2d 615, 622 (2d Cir. 1983) ("The mere fact that Ross

was told he would be accompanied by an IRS agent when he moved about the

restaurant did not place him in custody within the meaning of *Miranda* . . . .").

She may have been seized, but (as discussed above) not every seizure amounts to

custody.[7]  *See Newton*, 369 F.3d at 672.  A reasonable person would understand

that being accompanied in one's home by agents who are legally present to

execute a search warrant is a sensible precaution and that (absent other hallmarks

_____

[7]     As an alternative basis for affirmance, Faux argues that her statements
were the tainted fruit of an illegal detention under the Fourth Amendment and
should be suppressed.  But, for the reasons already discussed, Faux has failed to
demonstrate that the officers exceeded the scope of their authority to properly
execute a search warrant.  *See Michigan v. Summers*, 452 U.S. 692, 705 (1981).

of custody) freedom of action is not being curtailed "to a degree associated with formal arrest." *Id.* Although she was not permitted to go from room to room without being accompanied, she was not "completely at the mercy of the police." *Newton*, 369 F.3d at 675 (quoting *Berkemer*, 468 U.S. at 438).

Fourth, the district court found that Faux was "never told that she was free to leave or that she had a choice whether to respond to questioning." *Faux*, 94 F. Supp. 3d at 276. That finding is valid only up to a point: as the district court recounted, Faux was told 20 minutes into the interview that she was "not under arrest." Although Faux was never told she was "free to leave" in so many words, a lay person can reasonably be expected to have an understanding of what "arrest" means. "[A] reasonable person told . . . that he was not under arrest would likely have understood that he was not about to be removed from his home to the police station -- a significant factor in assessing the degree to which one is at 'the mercy' of the authorities." *Newton*, 369 F.3d at 677 (internal citation omitted).

Fifth, the district court found that Faux and her husband canceled their vacation in order to remain at the house during the search. Without finding that the agents actually told Faux she had to cancel, the district court concluded that

19

"that is the message that would have been communicated to a reasonable person in Faux's situation." *Faux*, 94 F. Supp. 3d at 277.  This circumstance carries little weight in the custody analysis.  The Supreme Court considered that "we may safely assume that most citizens -- unless they intend flight to avoid arrest -- would elect to remain in order to observe the search of their possessions." *Michigan v. Summers*, 452 U.S. 692, 701 (1981).  The record indicates that Faux chose to forgo vacation in order to deal with an ongoing search of her home incident to a criminal investigation.  It is difficult to imagine that Faux would have embarked on vacation given what was going on.  Even if she formed a mistaken impression that she must cancel her vacation to be present for the execution of the search warrant, the officers had no duty to correct Faux's mis-impression.

In sum, the district court accorded too much weight to these circumstances, which it classed as "aggravating factors."  *See Faux*, 94 F. Supp. 3d at 275.

### III

Under our precedents, the circumstances of Faux's interrogation militate against a finding of custody.  Faux was questioned in the familiar surroundings

20

of her home.  *See FNU LNU*, 653 F.3d at 153.  She was seated at her own dining

room table.  *See Beckwith v. United States*, 425 U.S. 341, 342 (1976).  She was not

handcuffed during the interrogation and was not arrested at its conclusion.  *See*

*Newton*, 369 F.3d at 663.  The agents did not display their weapons or otherwise

threaten or use any physical force.  *See Badmus*, 325 F.3d at 136.[8]  Faux claims the

agents "held her arm" as they escorted her to her dining room for the interview;

but the agents denied this, the district court made no finding one way or the

other, and the gesture is not described as being forceful.  In short, there is no

evidence that physical force was used, or threatened.

On this record, and given our precedents, it must be concluded that Faux

was not in custody.  True, the two-hour interview was conducted while officers

swarmed about her home.  But she was told 20 minutes into the interview that

she was not under arrest; she was never told that she was *not* free to leave; she

---

[8]  This distinguishes our case from the "police-dominated environment" that led to a custody finding by the Ninth Circuit in *Craighead*.  There, the agents unholstered their weapons in the presence of the defendant several times.  539 F.3d at 1084-88.  The interrogation took place in a "back storage room" where the door was closed behind the defendant and one of the armed officers stood blocking the door, silently.  *Id.*  There is no indication in this case that any of the agents physically imposed themselves to prevent Faux from leaving the dining room; in fact, she was permitted to move throughout the house, albeit accompanied by an agent.

did not seek to end the encounter, or to leave the house, or to join her husband; the tone of the questioning was largely conversational; there is no indication that the agents raised their voices, showed firearms, or made threats.  Her movements were monitored but not restricted, certainly not to the degree of a person under formal arrest.  She was thus never "completely at the mercy of" the agents in her home.

Faux's statements should not have been suppressed, because no *Miranda* warnings were necessary.

## CONCLUSION

For the foregoing reasons, we vacate the order of the district court and remand for proceedings not inconsistent with this opinion.